Bernard Goldstein and Wife, Evelyn F. Goldstein v. Commissioner. Leah Goldstein Weise v. Commissioner. Flo Goldstein v. Commissioner.
Goldstein v. Commissioner
Docket Nos. 53886-53888.
United States Tax Court
T.C. Memo 1957-218; 1957 Tax Ct. Memo LEXIS 27; 16 T.C.M. (CCH) 1000; T.C.M. (RIA) 57218; November 29, 1957
William Waller, Esq., American Trust Building, Nashville, Tenn., for the petitioners. Miller Bowen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following income tax deficiencies: Petitioner
1949
1950
1951
Bernard Goldstein
and Evelyn F.
Goldstein
$2,896.29
$3,035.12
$3,417.96
Leah Goldstein
Weise
155.25
160.54
183.21
Flo Goldstein
268.71
284.27
319.14
The only question is whether respondent was correct in requiring a partnership to depreciate the cost of certain improvements to leased property over the estimated life of the improvements rather than to amortize it over the term of the lease. Findings of Fact The stipulated facts *28 are hereby found. Petitioners resided in Murfreesboro, Tennessee, and filed their income tax returns with the collector of internal revenue for the district of Tennessee during the years 1949, 1950 and 1951. During these same years all petitioners except Evelyn Goldstein were members of a partnership which operated "Goldstein's," a department store in Murfreesboro, and which filed partnership returns with the same collector as did petitioners. Evelyn is involved in this controversy solely because she filed a joint return for the years in issue with her husband, Bernard Goldstein. William Goldstein, the father of petitioners Bernard and Leah Goldstein Weise, and father-in-law of Flo Goldstein, founded Goldstein's in 1887, and in 1913 he purchased land and a building, henceforth called "original property," which was used by Goldstein's as its place of business from 1913 through 1951. William died in 1930 and by will devised this property to his children in the following proportions; one-half to David Goldstein; one-sixth to Maurice Goldstein; one-sixth to petitioner Bernard; and one-sixth to petitioner Leah. David died in 1942 and his one-half interest was acquired by his wife, petitioner *29 Flo. Maurice died in 1948 and his one-sixth interest was acquired by his wife, Louise Goldstein. During the years in issue the original property was owned as follows: 50 per cent by Flo; 16 2/3 per cent by Bernard; 16 2/3 per cent by Leah; and 16 2/3 per cent by Louise. William, within 2 years prior to his death, gave his interest in Goldstein's to David, Leah, Maurice and Bernard and apparently from this date through 1951 the business was operated as a partnership. David was the managing partner of Goldstein's until his death in 1942, at which time Bernard took over. During the years 1930 through 1946, the owners of the original property and the partnership had an oral agreement that the latter would have the privilege of mortgaging the original property in order to borrow money for the use of the partnership. In accordance with this agreement the original property was mortgaged in 1931 and this mortgage was renewed in 1936. It was again mortgaged in 1938. In 1945, Bernard and his wife, Evelyn, acquired a lot in Murfreesboro, henceforth called "new property," which was immediately to the rear of Goldstein's department store. On January 1, 1946, this lot was owned one-half by Bernard *30 and one-half by Evelyn. The partnership had no written agreement. During the years in issue it consisted of Bernard, Leah, Flo and Louise. Bernard drew a salary of $6,300 per annum and received 75 per cent of the profits after salaries. Leah drew a salary of $2,100 and received 10 per cent of the profits after salaries. Flo drew a salary of $2,100 and received 15 per cent of the profits after salaries. Louise drew interest at the rate of 6 per cent per annum on capital invested in the partnership by her deceased husband, Maurice, but did not otherwise share in the profits. Bernard purchased Louise's share in the partnership in April 1952. In 1946, the original store building was obsolete and worn out and additional space was needed. The new property had been purchased with the purpose of erecting a building on it. From 1930 to 1946, the partnership occupied the original property under an oral lease and paid $3,600 per year as rent from 1942 through 1945. On January 1, 1946, the partnership and the owners of the original property entered into a written lease which read: "in consideration of * * * $3,600.00 * * * per year * * * we, Bernard * * * Flo * * * Maurice * * * and * *31 * * Leah * * * have this day leased * * * to GOLDSTEINS, a partnership, for a period of ten years beginning January the 1st, 1946 and terminating December the 31st, 1955, the * * * [original property]. * * *
"During the term of this lease, the Lessee, partnership shall pay all taxes, maintenance and shall keep the improvements insured for the benefit of the Lessors against loss by fire or storm * * *. The Lessee shall have the right to do any improving and remodelling which it may desire, but the same shall be done at the cost of the Lessee and at its sole risk. * * *
"In the event that these premises are sold during the term of this lease, the proceeds * * * shall be distributed to the owners of the property in the following propotion [proportion]; Of the first $35,000.00 - 50% is to go to * * * Flo * * *, 16 2/3% to Bernard * * *, 16 2/3% to Maurice * * * and 16 2/3% to * * * Leah * * *. All of the proceeds of this property over and above the sum of $35,000.00 shall be distributed as follows; to Bernard * * * 60%, to * * * Flo * * * 15%, to Maurice * * * 12 1/2% and to * * * Leah * * * 12 1/2%." Also on January 1, 1946, the partnership and the owners of the new *32 property entered into a written lease which read: "in consideration of the sum of * * * $1,800.00 per year * * * we, Bernard * * * and * * * Evelyn * * * have this day leased * * * to GOLDSTEINS, a partnership, for a period of ten years beginning January the 1st, 1946 and terminating December the 31st, 1955, the * * * [new property]. * * *
"During the term of this lease, the Lessee, partnership, shall pay all taxes, maintenance and shall keep the improvements insured for the benefit of the Lessors against loss by fire or storm * * *. The Lessee shall have the right to do any improving and remodelling which it may desire, but the same shall be done at the cost of the Lessee and at its sole risk. * * *
"In the event that these premises are sold during the term of this lease, the proceeds * * * shall be distributed to the owners of the property in the following proportion; Of the first $10,000.00 - 50% is to go to Bernard * * * and 50% to * * * Evelyn * * *. All of the proceeds of this property over and above the sum of $10,000.00 shall be distributed as follows; to Bernard * * * 60%, to * * * Flo * * * 15%, to Maurice * * * 12 1/2% and to * * * Leah * * * 12 1/2%." *33 These leases contained no renewal provisions. It was contemplated at the time the two leases were executed that the partnership would improve the old building and erect the new building. The partnership commenced the remodeling and general improvement of the department store building located on the original property in 1946 and in the same year commenced the erection of a 2-story building on the new property. The proceeds of a loan secured by one mortgage on the original building and the second lot were used by the partnership to pay in part for these improvements and additions. The new building was connected to the old building. The partnership expended a total of $121,755.36 for improvements to the old building and the erection of the new building. Of this amount, $2,000 was paid by it in 1945 for architect's fees and the remaining $119,755.36 was expended in 1946 and 1947. The partnership claimed depreciation on the leasehold improvements of $12,174.44, $12,174.44 and $12,174.43 in the years 1949 through 1951, respectively, computed to return the cost of these improvements over a 10-year period. Respondent determined that the leasehold improvements had an adjusted basis *34 of $87,221.02 on January 1, 1949, and that they should be depreciated over the estimated remaining useful life of the various assets and not amortized over the remaining life of the lease. Respondent reduced the depreciation deduction claimed by the partnership by $7,539.35, $7,539.35 and $7,539.34 in the years 1949 through 1951, respectively, which had the effect of increasing the partner's distributive share of partnership profits in the following amounts: Partner
1949
1950
1951
Bernard
$5,654.51
$5,654.51
$5,654.51
Leah
753.93
753.94
753.93
Flo
1,130.91
1,130.90
1,130.90
The net sales of the partnership for 1949 through 1951 were $598,517, $628,249 and $658,852, respectively. The customary rental on the type of property leased by the partnership was 2 1/2 per cent to 3 per cent of net sales, the tenant paying taxes and insurance. The partnership's annual cost for the improvements (the total cost prorated over the terms of the leases) plus its annual rent for both properties were less than 3 per cent of net sales in 1949 through 1951. The leases were not unfair or unreasonable to the partnership, and their terms were final and definite. The *35 expenditures by the partnership for improvements were not out of proportion to the benefits which it could expect to obtain from them during the terms of the leases. Opinion The question here is whether the partnership composed of petitioners can deduct, over the stipulated term of a lease, the cost of improvements made by them as lessees. While ordinarily the solution owuld be simple, Hess Brothers, 7 B.T.A. 729; Regs. 111, sec. 29.23(a)-10, respondent insists that in effect this was not a lease for a specific term because of the intimate relationship of the parties, that it amounted to an indefinitely renewable tenure, and that, consequently, depreciation is limited not by the term of the lease but by the life of the improvement. See Standard Tube Co., 6 T.C. 950. We have been referred to no precedent for the principle that a lease with a specified expiration date and no renewal option becomes indefinite merely because the parties are related, and we have found none. In the most nearly comparable situation to these facts, Fort Wharf Ice Co., 23 T.C. 202, acq. 1955 C.B. 4, the lessor and lessee were closely related corporations *36 in which the majority stockholders were identical. We, neverthless, held that with a specific term and in the absence of a renewal provision, depreciation should be computed by limiting the useful life to the period of the lease. Respondent's only effort to distinguish that case is that there "by the expressed terms of the lease, title to the building and equipment to be erected by the lessee was to pass to the lessor at the end of the 10-year lease." But this is a distinction without a difference because under the applicable Tennessee law the improvements, in the absence of a contrary agreement, would become the unencumbered property of the lessor, if not upon their creation, at least by the end of the term. Dudzick v. Lewis, 175 Tenn. 246, 133 S.W. 2d 496. To this may be added the fact appearing from the record and incorporated in our findings that even including the annually depreciating cost of the improvements, the rent paid by the lessees was reasonable. The principal purpose of distinguishing business dealings between closely related parties from other situations is to eliminate the fear that the same arrangement could not have occurred between strangers - a *37 result ordinarily to be gathered by the unreasonableness on one side or the other of the transaction under scrutiny. But "[we] are constrained to hold upon the present record that * * * petitioner's lease with its related lessor is fair and reasonable and had the same result as arm's-length negotiations between strangers." Jos. N. Neel Co., 22 T.C. 1083, 1090, acq. 1954-2 C.B. 5. Respondent seeks to attack the testimony upon which our finding of reasonableness is based because he construes it as referring only to improved property, and the leased premises in this case were partly unimproved at the date of the lease. In the same breath he argues that the lessees' contribution of the improvements was voluntary in the sense that the lease did not require them, and thus seeks to distinguish Jos. N. Neel Co., supra. But, of course, if the improvements had not been made and no depreciation was taken, the total cost to the lessees would have been radically reduced. Conversely, the contribution of the improvements by the lessees, which gives rise to the depreciation and hence to their higher occupancy cost, converted the premises from unimproved to *38 improved property. The conclusion must be that the payments called for by the lease, added to the aliquot cost of the improvements, were a reasonable rent for the improved property by the same token that the rent originally called for by the lease would have been reasonable had the property been left in its original condition. There is no evidence in the record and nothing from which we can draw an inference that this lease was for an indefinite period, or tha the lessees could be assured of a renewal at anything less than a newly fixed rent which would take into consideration the then value of the improved property. We conclude that the depreciation claimed should have been allowed. Decisions will be entered for the petitioners.